IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                              CRIMINAL CASE NO. 2:19-00176

BRIAN KEITH WINGROVE, JR.


## MEMORANDUM OPINION AND ORDER

Before the court is the motion of Defendant Brian Keith
Wingrove, Jr. ("Wingrove") to suppress all evidence seized from
his residence pursuant to the search warrant granted and
executed on February 28, 2018.  ECF No. 22.  The motion has been
fully briefed, and the court held a hearing on October 29, 2019.
For the reasons set forth below, the motion to suppress is
**DENIED**.

## I.   Background

The evidence in this case was developed from Detective
James R. Pack's Affidavit describing the events of February 28,
2018, the search warrant for Wingrove's residence granted
February 28, 2018, Parole Services' Response Matrix Worksheet
files on Wingrove, and from Det. Pack's, Parole Officer Jessica
Crook's, and Sgt. C.A. Young's witness testimony given at the
suppression hearing held before the court on October 29, 2019.
The relevant evidence is as follows.

Wingrove was convicted in 2005 of felony first degree armed

robbery and in 2015 of being a felon in possession of a firearm. In April 2017, the State of West Virginia released Wingrove on parole, which included the following condition:

> q. A parolee or probationer shall submit to a search without warrant of his or her person, place of residency or motor vehicle by his or her parole officer for supervision purposes at any time during the parole period.

By September 7, 2017, Wingrove had missed multiple parole appointments and it was determined that he had absconded from parole. On September 11, 2017, the State of West Virginia issued a warrant for Wingrove's arrest for his parole violations. In early 2018, Sgt. C.A. Young, of the Central West Virginia Drug Task Force, received information through a tip from a separate ongoing DEA investigation that Wingrove was living in a trailer in Oak Hill, West Virginia, was involved in drug dealing, and possessed a firearm. Sgt. Young called the West Virginia Department of Corrections Parole Services office and communicated this information to Parole Officer Heather Crook. Heather Crook relayed the information on Wingrove's suspected activities and whereabouts to Parole Officer Jessica Crook, Wingrove's parole officer. Jessica Crook then requested that Oak Hill Police Department officers accompany her and Heather Crook to Wingrove's trailer, aid in the arrest of Wingrove, and provide security during a walkthrough of the

trailer if it was in fact Wingrove's residence.[1]

On February 28, 2018, officers with the Central West
Virginia Drug Task Force, Oak Hill Police Department, and West
Virginia Division of Corrections Parole Services office went to
46 Trump Street, Oak Hill, West Virginia, to arrest Wingrove on
a parole violation warrant.  Officers present at the scene
included Det. Pack, Cpl. J.A. Jones, Ofc. M.D. Grose, and Parole
Officers Jessica Crook and Heather Crook.  Det. Pack testified
that police officers present were aware that Wingrove absconded
from parole, that there was a warrant for his arrest, and that
the Drug Task Force had received information that Wingrove
possessed a firearm and was conducting drug transactions at the
trailer.  Det. Pack also testified at the hearing that the
trailer park where Wingrove was located was known by police to
be a high crime area.

When officers approached the trailer at 46 Trump Street,
they saw two cars parked in the trailer's driveway – a pewter-
in-color Chevrolet Silverado and a silver Dodge Charger.
Advancing upon the trailer, Cpl. Jones, Ofc. Grose, and Parole

---

[1] At the hearing, Parole Officer Jessica Crook explained that it
was the parole office's common practice to request that police
accompany parole officers on their visits when a warrant for the
parolee's arrest had been issued.  She also testified that it
was her intention to have Wingrove arrested for his parole
violations and to search Wingrove's trailer to determine if he
was committing additional parole violations.

Officer Jessica Crook went to the front door, and Det. Pack and Parole Officer Heather Crook went to secure the rear of the trailer. One of the officers at the front knocked on the door. Det. Pack then heard movement from inside the trailer, as if someone had moved from the far back side of the trailer to the front section of the trailer and then moved back to the rear door. The rear door of the trailer then opened and Wingrove exited the trailer. According to Det. Pack, Wingrove exited the door quickly and showed surprise at the presence of the officers. Wingrove had taken only one step outside the door before Det. Pack drew his firearm and instructed Wingrove to get on the ground. Wingrove complied and was handcuffed on the ground outside the trailer. Following Wingrove's exit from the trailer, Det. Pack testified that he did not hear any other sounds coming from inside the trailer, but that he was busy detaining Wingrove during that time and so could not be certain.

After Wingrove was handcuffed, Det. Pack and another police officer entered the residence and cleared it – the "protective sweep" at issue in this case. While clearing the area believed to be Wingrove's bedroom to the right of the rear entrance, Det. Pack observed a spoon with what appeared to a be a piece of a cigarette filter and some off-white substance believed to be methamphetamine on it, a purple cube-like container with a white-in-color powdery substance believed to be methamphetamine

in it, and multiple needles that were in plain view on a table. On the floor below this table, also in plain view, was a black bag with what appeared to be a considerable amount of U.S. currency in it.  Officers did not seize these items at that time.

Once the police officers completed their sweep of the trailer, Parole Officers Heather Crook and Jessica Crook conducted their own security sweep of the residence.  After determining there were no other persons in the trailer, Jessica Crook asked Wingrove whether this trailer was his residence, and she testified that Wingrove answered in the affirmative.  Once she determined that the trailer was Wingrove's residence, she then walked through the trailer looking for any parole violations.  Upon doing so, she testified that she saw drugs and money in plain view, which she subsequently discussed with Det. Pack and the other officers on the scene after completing her walkthrough search.

After the residence was cleared, Wingrove was placed inside a vehicle.  Several officers, including Det. Pack and Jessica Crook, stayed behind.  Det. Pack and other officers observed through the rear driver's side window of the pewter Chevrolet Silverado what appeared to be an AR-15 in plain view.  Officers also observed through the rear passenger's side window of the silver Dodge Charger what appeared to be the butt end of a

firearm.[2]

Det. Pack then relayed what he had seen inside the residence and inside the cars to Det. J.G. Hoover, who applied for and obtained a search warrant for the trailer. There were two stated grounds for the search warrant in Det. Hoover's affidavit seeking the search warrant:

1) "Members of the Central West Virginia Drug Task Force, Oak Hill Police Department and the West Virginia State Police have received numerous complaints about the distribution of controlled substances from this residence."

2) "While members of the Oak Hill Police Department were at the residence for the purpose of a probation violation, they discovered what they stated to be a large amount of a clear crystal substance believed to be Methamphetamine, a scheduled [sic] II controlled substance."

The search warrant was obtained on February 28, 2018 in the County of Fayette, West Virginia, and the search was executed about an hour later the same day. From the search of the trailer, the police recovered 51 grams of methamphetamine, 47 Suboxone strips, $2,306 in United States currency, a digital scale, and a handgun. Wingrove was subsequently charged in the Southern District of West Virginia with (1) possession with

---

[2] The search warrant, per its terms describing the premises to be searched, does not extend to the two cars parked on the premises. The court is uncertain if the firearms in the cars were ever seized by the government. Regardless, if items were in fact seized from the cars, the defendant has not challenged any such seizure.

intent to distribute methamphetamine in violation of 21 U.S.C. §
841(a)(1); (2) possession with intent to distribute
buprenorphine in violation of 21 U.S.C. § 841(a)(1); (3)
possession of a firearm in furtherance of a drug trafficking
crime in violation of 18 U.S.C. § 924(c)(1)(A); and (4) being a
felon in possession of a firearm in violation of 18 U.S.C. §§
922(g)(1), 924(a)(2).

## II.  **Analysis**

Wingrove moves to suppress the evidence gathered from
inside the trailer on the ground that the warrant to search the
trailer was based upon the officers' observations from an
illegal warrantless search of his residence.  He argues that
after excluding the information related to the unlawful search
from the affidavit supplying the basis for the search warrant,
the remaining portion of the search warrant does not contain
sufficient grounds to create probable cause to grant the
warrant.  Wingrove further contends that Parole Officer Jessica
Crook's walkthrough search of the trailer, where she also saw
the drugs and then reported her findings to Det. Pack, cannot
serve as an independent source for admission of the evidence,
because Parole Officer Jessica Crook's search did not comply
with the terms of Wingrove's parole condition authorizing
warrantless searches by parole officers for supervisory
purposes.

The government counters by arguing that the police officers were permitted under Maryland v. Buie, 494 U.S. 325 (1990), to conduct the "protective sweep" during which they saw the drugs in the trailer. Alternatively, the government argues that the information Parole Officer Jessica Crook supplied to Det. Pack following her supervisory parole search is a lawful and independent source for the search warrant's factual basis.

The court finds that the police's protective sweep was lawful and, alternatively, finds that Parole Officer Jessica Crook's supervisory search provides a lawful and independent basis of the information used to obtain the search warrant.

### A.   *The protective sweep was lawful.*

The Fourth Amendment ensures the people's right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A person's home is accorded a significant privacy interest under the Fourth Amendment and, absent an exception, the "threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). As such, warrantless entries into a residence are presumptively unreasonable, and the government bears the burden of rebutting that presumption. Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984); United States v. Mowatt, 513 F.3d 395, 399 (4th Cir. 2008).

However, in Buie, the Supreme Court held that police officers, incident to an arrest, may conduct a precautionary protective sweep of areas "immediately adjoining the place of arrest from which an attack could be immediately launched," without probable cause. 494 U.S. at 334. The purpose of this exception to the warrant requirement is to allow officers to take reasonable steps "to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them." Id. at 333. Protective sweeps are not permitted after every arrest as a matter of course, however; the Supreme Court has established that protective sweeps are only lawful when officers possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334.

The fact that Wingrove was arrested outside, rather than inside his home, is not pertinent to the Buie analysis. The Fourth Circuit has established that the protective sweep doctrine allows searches of the arrestee's home even when the arrest occurs just outside the home. See United States v. Jones, 667 F.3d 477, 485 n.10 (4th Cir. 2012) (holding the same after noting that "virtually all of our sister circuits have

recognized that the <u>Buie</u> protective sweep doctrine applies to an
arrest occurring just outside a residence").

The issue here is whether the police possessed sufficient
articulable facts to create a reasonable belief that another
dangerous individual was present in the area to be searched.
Because of the officers' knowledge of Wingrove's drug dealing
combined with the fact that multiple cars were parked in
Wingrove's driveway at the time of the arrest, the court finds
that the police possessed sufficient articulable facts to
justify their protective sweep of Wingrove's residence.

The Fourth Circuit, in addressing the appropriate bounds of
the protective sweep doctrine, has stated that knowledge of drug
transactions occurring at the premises is the kind of
articulable fact that justifies a protective sweep.[3]  <u>See id.</u>  As

_____

[3] On its own, knowledge that a person deals drugs does not
justify a protective sweep.  <u>See, e.g.</u>, <u>United States v.
Delgado-Perez</u>, 867 F.3d 244, 254 (1st Cir. 2017) ("We have never
held that because the person arrested is sought for drug
trafficking, it is reasonable to suspect for that reason alone
that there may be another person in the home who poses a danger
to officer safety."); <u>United States v. Moran Vargas</u>, 376 F.3d
112, 116 (2d Cir. 2004) (suspicion that the defendant was a drug
courier, without more, is insufficient to justify a protective
sweep); <u>United States v. Taylor</u>, 248 F.3d 506, 514 (6th Cir.
2001) (generalized suspicion that defendant was a drug dealer
was inadequate, standing alone, to justify protective sweep).
However, courts approve of protective sweeps where police
possessed knowledge of drug dealing plus some other relevant
articulable fact(s).  For example, in <u>Jones</u>, the Fourth Circuit
upheld the sweep due to "the presence of the seven vehicles
[parked on the premises] *coupled with* . . . prior surveillance

Det. Pack testified, drug transactions by their very nature
generally require at least two persons, and these persons are
often dangerous.  Cf. Harmelin v. Michigan, 501 U.S. 957, 1002-
03 (1991) (citing studies demonstrating "a direct nexus between
illegal drugs and crimes of violence"); Tunnell v. Gill, 2018 WL
4154130, at *7-8 (D. Kan. Aug. 30, 2018) ("[D]rug trafficking
[is] an activity typically requiring more than one person.").
Here, the police officers had a reasonable basis to believe
Wingrove was engaging in drug transactions due to the
information supplied by Sgt. Young that was uncovered during his
DEA investigation.[4]

---

of known meth users patronizing the Jones residence."  Jones,
667 F.3d at 485 (emphasis added).

[4] The court notes that the evidence of drug dealing here is
weaker than in other cases upholding a protective sweep due
reported drug dealing at the residence.  For example, in other
cases, police officers personally witnessed known drug
purchasers enter a residence over a lengthy period of time.
See, e.g., United States v. Lawlor, 406 F.3d 37, 42 (1st Cir.
2005) (upholding protective sweep where "over the years, [the
officer] had routinely observed 'individuals coming and going
from th[e] house'"); United States v. Cavely, 318 F.3d 987, 996
(10th Cir. 2003) (upholding protective sweep where, "[a]mong
other things, the officers had a clear indication of on-going
methamphetamine production at the house").  Or, police witnessed
or knew that another person had entered the residence prior to
the arrest and protective sweep.  See, e.g., United States v.
Starnes, 741 F.3d 804, 808 (7th Cir. 2013) (upholding search
where the officers "had reliable information that drugs were
being sold from . . . the house and that a shooting had occurred
on the premises just a few hours prior"); United States v. Hauk,
412 F.3d 1179, 1192 (10th Cir. 2005) (upholding protective sweep
where officers had suspicion of defendant's drug dealing and
officers saw an unidentified man park his car and enter the

Courts consistently find that drug trafficking, when combined with other articulable facts, creates a reasonable belief that other dangerous persons are nearby. See United States v. Jones, 667 F.3d 477, 485 (4th Cir. 2012) (upholding a protective sweep due to "the presence of the seven vehicles [parked on the premises] coupled with . . . prior surveillance of known meth users patronizing the Jones residence"); see also United States v. Williams, 871 F.3d 1197, 1202 (11th Cir. 2017) (holding that a protective sweep was justified because officers noted the subject's car and two other cars parked in the driveway and that previous surveillance had indicated potential drug trafficking activities on the property). Thus, the protective sweep is valid against Wingrove here because there is another articulable fact which creates the reasonable suspicion justifying the sweep: the fact that multiple cars were parked in Wingrove's driveway.

Multiple cars parked in an arrestee's driveway is a relevant articulable fact that helps justify a protective sweep. See Jones, 667 F.3d at 485. Multiple cars present at a residence reasonably creates the inference that multiple persons

---

defendant's home). Here, while the police had the information Sgt. Young received from a tip in another investigation, the police did not have firsthand knowledge of Wingrove's drug-related activities nor did they ever see possible confederates enter Wingrove's trailer.

are present.  Det. Pack and Parole Officer Jessica Crook both testified that they did not know whether or not one or both of the cars parked in the driveway belonged to Wingrove.  Jessica Crook also testified that, to the best of her knowledge, Wingrove's parole supervision file did not contain any mention of either of the vehicles present at the scene.  Therefore, the presence of multiple vehicles, which were not known to be owned by Wingrove, reasonably suggests that multiple persons were present inside the trailer.  Moreover, these additional persons were reasonably deemed to be dangerous individuals given the reports of Wingrove's drug dealings.  Compare Henderson v. Motley, 2014 WL 3661107, at *9 (W.D. Va. July 22, 2014) (invalidating a protective sweep in spite of the presence of multiple vehicles because there were no additional indications that these additional persons were dangerous).

Wingrove's reported possession of a firearm at his residence constitutes an additional relevant articulable fact. Knowledge that a firearm is present inside a residence cannot itself be an articulable fact, as a firearm without someone to wield it would not reasonably threaten the safety of officers. See United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005) (invalidating protective sweep where, despite facts suggesting that there might be a gun in the apartment, there were no "specific and articulable facts" suggesting the presence of

third party who could use it); <u>United States v. Tisdale</u>, 921
F.2d 1095, 1097 (10th Cir. 1990) ("[T]he danger which justifies
a protective sweep comes from the possible presence of *other*
armed and dangerous persons in the vicinity.").  Here, however,
there are such articulable facts, <u>see supra</u>, that other
dangerous persons were possibly present inside the residence and
thus could use any firearm present.  Therefore, the reported
presence of a firearm within the residence, combined with the
reasonable suspicion that other dangerous persons may be present
to use the firearm, justifies the officers' protective sweep.

Though the court is convinced that the protective sweep is
justified by the reports of drug dealing and firearms and the
presence of multiple vehicles, the government argues that there
are additional facts supporting the decision by police to
conduct the protective sweep.  First, the government contends
that Wingrove attempted to flee from officers, and attempted
flight can reasonably signify danger or the presence of other
individuals.  Second, the government argues that officers were
in danger due to their position out in the open near the
residence.  The court is not persuaded by either line of
argument, but will include its analysis for completeness of the
record.

Attempted flight is an additional factor that several
courts have found is a relevant articulable fact.  <u>See, e.g.</u>,

United States v. Meza-Corrales, 183 F.3d 1116, 1124 (9th Cir. 1999) (recognizing attempted flight of two persons as a fifth fact among six facts justifying the protective sweep). Flight as an articulable fact is sourced from the Terry stop context, where an officer confronting a nervous, furtive, or fleeing suspect on the street has an articulable reason to be concerned for his safety and may therefore conduct a Terry stop and frisk. See Terry v. Ohio, 392 U.S. 1 (1968). Some courts have applied this same reasoning to the protective sweep context, reasoning that there is "no reason why [protective sweep] analysis should not be extended from the Terry context to the Buie context, given that the level of suspicion "is no more and no less than was required in Terry." United States v. Cash, 378 F.3d 745, 748 (8th Cir. 2004) (quoting Buie, 494 U.S. at 334).

However, assuming without deciding that attempted flight may serve as an articulable fact as a matter of law, the court is not convinced that Wingrove actually attempted to flee. Det. Pack testified that Wingrove was detained after taking only one step outside the trailer. Although Det. Pack added that Wingrove showed surprise at the presence of the officers at the back of the trailer, being a mere one step removed from a residence does not suggest attempted flight. Moreover, Det. Pack further testified that Wingrove complied with all commands

given by Det. Pack once Wingrove emerged from the trailer. The court is thus not persuaded that Wingrove attempted to flee.

The government also contends that the trailer's thin walls and the officers' position outside the trailer justifies the protective sweep.[5] This is unpersuasive. The Fourth Circuit has commented that officers are in less danger when they make an arrest outside, rather than inside a defendant's home. See Pena v. Porter, 316 F. App'x 303 (4th Cir. 2009) ("[P]rotective sweeps are not justified as a matter of course. . . . Outside of a home, the risk of danger to police officers is substantially diminished."); see also United States v. Carter, 360 F.3d 1235, 1242 (10th Cir. 2004) ("Officers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home. The risk is substantially diminished when the officers effect the arrest outside the home."); but see United States v. Maldonado, 472 F.3d 388, 395 (5th Cir. 2006) (determining that a protective sweep was justified based on the fact that agents were exposed in an open area surrounding a trailer even though agents had no certain knowledge that other individuals were in the trailer).

---

[5] Det. Pack also testified that the surrounding area was a high crime area. However, Buie cautions that this does not validate a protective sweep. See Maryland v. Buie, 494 U.S. 325, 334 n.2 (1990).

The facts known to Det. Pack and the police officers at the scene created a reasonable suspicion that a dangerous third party was inside Wingrove's trailer at the time of the arrest. Due to the combination of Wingrove's reported drug dealing, the presence of multiple cars in the trailer's driveway, and the reported presence of firearms in the trailer, the police possessed sufficient articulable facts in this case to justify their protective sweep.

Because the officers could conduct a protective sweep, their use of the evidence they found in plain view as grounds for the later search warrant does not taint the warrant. As the Supreme Court has explained, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment — or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). As part of the sweep, the officers saw the methamphetamine and other drug paraphernalia in plain view. It "was only coincidental that [the officers] discovered contraband in plain view while conducting the [protective] sweep." United States v. Yeary, 740 F.3d 569, 580 (11th Cir. 2014). The officers then obtained a search warrant for the trailer and seized the various items of

contraband.  As a result, all of the evidence found pursuant to the search warrant is admissible.

**B.** ***Parole Officer Jessica Crook's supervisory search is a valid lawful and independent source for the basis of the search warrant.***

As an alternative ground for admitting the evidence, the government argues that the information relayed to the police by Parole Officer Jessica Crook serves as an independent source for the search warrant's factual basis.  After Wingrove was arrested, Crook testified that she entered Wingrove's trailer to conduct a supervisory search to check for additional parole violations, and saw contraband in plain view which she reported to Det. Pack.  Crook's search was authorized by a condition of Wingrove's parole allowing warrantless searches by his parole officer for supervisory purposes.  To determine whether Crook's report to the police serves as a valid independent source, the court first considers whether her search was itself constitutional, and second considers whether her report to police meets the elements of a valid independent source.

**1. Parole Officer Crook's search was lawful.**

The Supreme Court has discussed warrantless searches of parolees/probationers[6] in three major cases.  The first is

---

[6] The Supreme Court has not treated parolees differently than probationers in this Fourth Amendment context, other than to

Griffin v. Wisconsin, 483 U.S. 868 (1987).  In Griffin, the
Supreme Court extended the "special needs" exception to the
warrant requirement to the State's operation of a probation or
parole system.  See id. at 873-80.  The Court explained that
probation supervision "is a 'special need' of the State
permitting a degree of impingement upon privacy that would not
be constitutional if applied to the public at large," and also
that "[a] warrant requirement would interfere to an appreciable
degree with the probation system."  Id. at 875-76.  However, the
Court limited its holding in Griffin by requiring that the
probation officer have "reasonable grounds" to conduct the
search, id. at 876, and by requiring that the probation
regulation authorizing warrantless searches – "as it has been
interpreted by state corrections officials and state courts" –
must serve and be complied with in a manner that actually serves
the special needs of parole.  See id. at 875.

    The second Supreme Court case is United States v. Knights,
534 U.S. 112 (2001).  In Knights, the Court was asked the
question of whether the Fourth Amendment limits searches
pursuant to a probation condition to only those searches with a
"probationary" purpose.  Id. at 116.  The Court answered no –

---

explain that parolees have even lower expectations of privacy
than do probationers.  See Samson v. California, 547 U.S. 843,
857 (2006).

even if searches of parolees or probationers did not have a probationary purpose that met the special needs exception to the warrant requirement as established in Griffin, a search could still be valid under the Fourth Amendment if it is found reasonable after balancing the government's interest in the search against the defendant's reasonable expectation of privacy.  See id. at 119-21.  Given the high governmental interest in supervising probationers, and the low reasonable expectation of privacy that probationers have (which is further lowered when a defendant has agreed to allow warrantless searches as a condition of probation), warrantless searches by probation officers are reasonable and valid so long as the officer has reasonable suspicion of criminal activity.  See id. Therefore, the official purpose of the probation condition, as well as the purpose of the search itself, is irrelevant.  See id. at 122 ("Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose.").

In the third case, Samson v. California, the Supreme Court upheld warrantless and suspicionless searches of parolees whose conditions of parole authorized warrantless searches.  547 U.S. 843, 857 (2006).  In reaching that result, the Court determined that such searches comply with the Fourth Amendment because the

government's legitimate interest in searching parolees outweighs a parolee's reasonable expectation of privacy.  Id. at 850-57.

The Eastern District of North Carolina concisely explained how a court should use Griffin and Knights and Samson to evaluate the constitutionality of a warrantless search of a parolee:

> First, the court should determine whether the search was made for the purpose of the "special needs" of [parole], i.e. inquire whether the search was a "[parole] search" made pursuant to state law or regulation.  If the search was made for the special needs of [parole], then the court should apply Griffin.  In so doing, the court must determine whether the statute or regulation authorizing the search is reasonable and examine whether the search complied with the statute or regulation. A federal court is "bound by the state court's interpretation" of the statute or regulation, if such exists, but this "is relevant to [the] constitutional analysis only insofar as it fixes the meaning of the regulation [or statute]."
>
> If, on the other hand, the search was not made for the purpose of the special needs of . . . parole supervision, i.e. the search does not comply with a statute or regulation authorizing warrantless searches based upon the state's special needs, or the state law or regulation purporting to authorize such searches is itself unconstitutional, then the court must apply the Knights balancing test to determine the reasonableness of the search.  In conducting this balancing test, the court must weigh the state's legitimate governmental interests against the individual's privacy interests, giving due regard to any . . . parole condition authorizing warrantless searches.

United States v. Clark, 2017 WL 9485522, at *6–7 (E.D.N.C. June 27, 2017) (internal citations omitted).  The Fourth Circuit in United States v. Midgette followed a similar analytical process in considering whether a warrantless search of a North Carolina

probationer's home conducted pursuant to a condition of probation complied with the Fourth Amendment. 478 F.3d 616, 622-24 (4th Cir. 2007) (analyzing the search and the condition of parole authorizing warrantless searches under the <u>Griffin</u> special needs exception and under North Carolina law, then analyzing the reasonableness of the search, but not considering the search's purpose, under <u>Knights</u>).

Therefore, the first inquiry is a <u>Griffin</u> analysis of whether the searches by the police and by Parole Officer Jessica Crook were parole searches made pursuant to a condition of parole authorizing warrantless searches of parolees, and also whether the searches complied with this condition as interpreted by state courts.[7] Wingrove's relevant condition of parole is that he "shall submit to a search without warrant of his or her person, place of residency or motor vehicle by his or her parole officer for supervision purposes at any time during the parole period." The sweep conducted by the police following Wingrove's arrest is not a parole search because it was conducted by police for the purpose of securing the safety of the area, and not for supervising Wingrove as a parolee. It thus does not meet the special needs exception set out in <u>Griffin</u>. Moreover, the terms

---

[7] The court is unaware of any West Virginia court interpretations of the relevant parole condition authorizing warrantless supervisory searches by parole officers. The court thus interprets the condition using the plain meaning of its terms.

of the condition of parole authorize searches by the parole officer "for supervision purposes"; the terms do not authorize warrantless searches by police officers for non-supervision purposes, such as the security purposes at the heart of a protective sweep.

However, the later search of the trailer by Parole Officer Jessica Crook appears to be a parole search, and falls within the allotted terms of the parole condition. Parole Officer Jessica Crook testified that it is her common practice to do warrantless walkthroughs of her parolees' residences to check for parole violations. Here, Wingrove had violated his parole by absconding, and there were reports of additional drugs and firearms parole violations. Crook testified that she conducted a search of Wingrove's trailer for the purpose of supervising him and determining if those additional reports of violations were substantiated. If true, Crook's supervisory search would be lawful because it would be conducted pursuant to the special needs of parole as established by Griffin.

At the suppression hearing, though, Wingrove raised the issue of whether Crook's search truly was for supervisory purposes. He noted that Crook did not document her supervisory walkthrough search in her Response Metrics report, nor did she document the purpose of her search as supervisory. The court, after hearing Crook's testimony, finds her testimony and the

testimony of Det. Pack credible, and so does believe that her search was for supervisory purposes. Thus, Crook's search complies with the condition of parole and the special needs of parole exception to the warrant requirement.

In the alternative that the special needs exception is not met, applying Knights and Samson to Parole Officer Jessica Crook's search likewise yields the result that the searches were constitutional.[8]

The government's legitimate interest in searching parolees is substantial. The Supreme Court "has repeatedly acknowledged that a State has an 'overwhelming interest' in supervising parolees because 'parolees . . . are more likely to commit future criminal offenses.' . . . [A] State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." Samson, 547 U.S. at 853 (quoting Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 365 (1998) (explaining that the interest in combating recidivism "is the very premise behind the system of close parole supervision")). This high government interest in searching

_____

[8] The court declines to rule on whether the police's warrantless search, apart from Crook's search, would also be constitutional applying the Knights and Samson reasonableness balancing test.

parolees is largely due to the general fact that parolees "have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because [they] are aware that they may be subject to supervision and face revocation of probation [or parole]." United States v. Knights, 534 U.S. 112, 120 (2001). Furthermore, the State has an interest in helping rehabilitate and reintegrate ex-offenders, and the State uses parole officers' searches of parolees to effectively supervise its parolees and accomplish this interest. Because parole has the dual purpose of rehabilitating the offender and protecting society, it is constitutionally reasonable for a parole officer to search parolees in compliance with a parole agreement search provision, but without a warrant.

In stark contrast to the high government interest in searching parolees, a parolee possesses a very low reasonable expectation of privacy. See Samson, 547 U.S. at 850-57. This is because "parolees are on the 'continuum' of state-imposed punishments," and "parole is more akin to imprisonment than probation is." Id. at 850. The fact that a parolee may serve his parole period either in physical custody, or elect to complete his sentence out of physical custody and subject to certain conditions, displays the similarity between incarceration and parole. See id. at 851. And notably,

parolees technically remain in the legal custody of the State Department of Corrections while on parole.  See id.  Moreover, "[i]n most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements."  Scott, 524 U.S. at 365.

One such condition is a provision authorizing warrantless searches.  When a parolee has a condition of parole that allows warrantless searches, the parolee's reasonable expectation of privacy drops even further.  The Supreme Court has gone so far as to conclude that a parolee subject to such a condition of parole does not have "an[y] expectation of privacy that society would recognize as legitimate."  Samson, 547 U.S. at 852.  This is because acceptance of a clear and unambiguous search condition significantly diminishes any remaining reasonable expectations of privacy that parolees may have.  Knights, 534 U.S. at 119-20.

Applying this balancing of the government's interest against Wingrove's reasonable expectation of privacy in this case, it is clear that the parole condition authorizing such searches complies with the Fourth Amendment.  The government's legitimate interest in parole officers monitoring parolees is high, as explained above.  Moreover, Wingrove's absconding from parole and the reports of him committing additional parole violations of dealing drugs and possessing a firearm further

heightens the government's interest in conducting the
supervisory parole search of his residence, as reasonable
suspicion exists and the government's interest in combating
recidivism is more fully realized. In comparison, Wingrove's
reasonable expectation of privacy is incredibly low. He is a
parolee who has authorized warrantless searches by his parole
officer for supervisory purposes. While Wingrove did not
authorize warrantless searches by the police, or by his parole
officer for non-supervision purposes (assuming, arguendo, that
Crook's search was not properly supervisory), this only slightly
raises his expectation of privacy above the negligible degree
expressed in Samson. See id. at 852. Wingrove signed his
parole terms and thus was still clearly aware that he could be
subject to warrantless searches by his parole officer at any
time. See United States v. Pickens, 295 F. App'x 556, 558 (4th
Cir. 2008) (signing the parole agreement constitutes awareness
and acceptance of the parole condition authorizing warrantless
searches). Thus, though slightly raised above the expectation
of privacy held by the defendants in Knights or Samson,
Wingrove's reasonable expectation of privacy is still grossly
disproportionate to the high government interest in conducting
the search. See supra; see also Pickens, 295 F. App'x at 558
(upholding, pursuant to Samson, a warrantless search where the
parolee was subject to the exact same condition of parole as

here).  Therefore, Crook's search of Wingrove's trailer was reasonable and valid under the Fourth Amendment.

### 2. **Parole Officer Crook's report to police meets the independent source doctrine's requirements.**

The court now determines whether Parole Officer Jessica Crook's report to police of the contraband found within Wingrove's residence meets the elements of a valid independent source.  The independent source doctrine states that evidence gathered pursuant to an illegal search should not be suppressed when the evidence has or would have been discovered and admissible through a lawful independent source.  See Murray v. United States, 487 U.S. 533, 537–39 (1988).  Here, Crook's search was lawful, see supra, and serves as a functional independent source for the factual basis of the warrant.  There is no indication that the police informed Crook prior to Crook's search that the police had seen contraband inside Wingrove's residence.  Further, Crook testified that it was her regular practice to do supervisory walkthrough searches of her parolee's residence to check for parole violations.  Crook's search, and her viewing of Wingrove's contraband, would have happened whether or not the police conducted their protective sweep. Crook then reported the drugs she saw inside Wingrove's trailer to Det. Pack and the police.  Additionally, Det. Pack testified at the hearing that he instructed a fellow officer to seek a

28

search warrant after Crook reported the drugs she had seen in her walkthrough.

Therefore, the police would have acquired information of the methamphetamine inside Wingrove's trailer even had they not conducted their protective sweep, and likewise would have decided to seek a search warrant even had they not conducted their protective sweep. As such, after replacing the Oak Hill Police Department's discovery of the methamphetamine with Crook's independent report of the methamphetamine, the warrant's factual basis is independent of the fruits of the unlawful search while continuing to create sufficient probable cause. See United States v. Hill, 776 F.3d 243, 251 (4th Cir. 2015) ("To find the search with a warrant 'genuinely independent,' the unlawful search must not have affected (1) the officer's 'decision to seek the warrant' or (2) the magistrate judge's 'decision to issue [it].'" (quoting Murray, 487 U.S. at 542)). Accordingly, Crook's report to police serves as a lawful and independent source of the information used to obtain the warrant.

## III. Conclusion

The police officers' protective sweep of Wingrove's trailer subsequent to his arrest was supported by sufficient articulable facts. Additionally and alternatively, Parole Officer Jessica Crook's search and communication to the police of the drugs

inside Wingrove's residence serves as lawful and independent grounds for the search warrant. For the foregoing reasons, Wingrove's motion to suppress is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record, the United States Marshal for the Southern District of West Virginia, and the Probation Office of this court.

IT IS SO ORDERED this 5th day of November, 2019.

**ENTER:**

David A. Faber
Senior United States District Judge